Thank you. Please be seated. I'm sure you all are aware of the basic rules here in the court, but I just want to remind you that on the timing, when it turns yellow, you have which we can do past the time, but if we're not, you need to finish up your sentence and move on. So with that, we'll go ahead and get started with case number 24-60529, Mississippi v. Department of Energy, and we'll start with Joseph John for the State of Mississippi. Eddow. Good morning, Your Honor. Joseph St. John for Petitioner States, and I'd like to reserve four minutes for rebuttal. May it please the Court. We're here in yet another skirmish in the war on things that work. On the merits, this is a case about the Department of Energy once again ignoring reality and setting energy efficiency standards. The last go-around, it was ignoring that humans substitute energy inefficient handwashing for dishwashers that don't work. Here, it's ignoring the quite literally engineering textbook principles that if you make a device more complex or lighter weight, it's going to adversely affect the liability and lifespan. Not surprisingly, the Department doesn't offer much of a defense on the merits. On jurisdiction, it's gamesmanship. On the front end, as the agency would have it, it could evade notice and comment rulemaking, issue and maintain a direct final rule despite years of controversy and the opposition of 23 states, nearly half the union. On the back end, as the agency tells it, those states were required to file a petition for review before the statutory comment period closed and the agency had made its decision. To say that argument out loud should almost intuitively generate a response of, that can't be right, and it isn't. As always, jurisdiction first. Timing is presumptively not jurisdictional, and with apologies to the panel, we submitted a 28-J last night for the Supreme Court's opinion in Riley v. Bondi. It's what I call a we-really-mean-it opinion. In that case, Justice Alito reviewed jurisdictional versus claims processing precedent. He noted that since 2006, only a single case had found a requirement to be jurisdictional, and that was based on a century of provision-specific precedent that the Court was extraordinarily reluctant to overturn. So what's the takeaway? A jurisdictional deadline must be, quote, clearly signaled, end quote, by Congress, and the signal must be, quote, exceedingly strong, end quote. That's not the case here. Just like the provision in Riley, Section 6306 speaks to the person adversely affected. It speaks to the litigant, not to the courts, and that's a pretty good tell, as Justice Alito explained, that the provision is not jurisdictional. Regardless of whether it's jurisdictional, though, you run into this problem of how do you handle a two-stage decision-making process? You have a direct final rule that's published, and then you have a withdrawal decision following some period later. First, it's important to understand that the withdrawal decision or non-withdrawal decision does have a legal effect. The Department is simply wrong in arguing otherwise. It's that non-withdrawal decision that cuts off the Department from changing the energy efficiency standard because of the way the anti-blacksliding provision works. So until that decision is made, the Department can reduce it. Okay. I just want to try to understand. I realize that most humans don't agree on everything in life, and so the fact that the Department of Energy is making a standard and someone doesn't like it, how can they ever make a standard if someone's going to say it should be rejected and that ends it? I'm just a little bit confused about that. I understand that this is 23 states, which is more than just a somebody, but basically you're making the somebody argument, and so I'm trying to understand how can they ever make standards if they need everyone to like it, since making everyone in this room to like everything would be kind of difficult. Not the making the standard. It's the using the direct final rule process. That process specifically contemplates consensus. Have there been DFRs that weren't challenged? Have there been DFRs that weren't challenged? Not that have gone to the merits. No, no. Have agencies in the history of America ever issued direct final rules that did not result in a challenge in court? Presumably, yes, Your Honor, and I would think that's the idea. I'm talking about, though, the Department of Energy. He's asking that question, can you tell me about something, I don't mean 200 years ago, but let's just say within the last decades that they made something that no one had a problem with, that was meaningful, not just, hi, everyone, you have to be in the United States. There have been a whole series as a result of this settlement, and as I understand it, only two of them have been challenged, the dishwasher rule and this rule. And again, it's not the setting the standard itself, it's using the direct final rule process, which cuts out notice and comment. The direct final rule process where the agency just issues the rule without notice and comment, that is what requires consensus, and that's what Congress contemplated was a consensus process. It reminds me of, I've worked on Capitol Hill, I know some about the state legislatures, most legislative bodies, including Congress, have consent calendars, right, unanimous consent, meant specifically to expedite proceedings on matters that are, A, legal changes that need to happen, and B, utterly uncontroversial. Is that a useful analogy? That's where this came from. The history is these originated with EPA making technical decisions on state implementation plans. The law needs to change, so something, right, but nobody has a problem with it, it's consensus. Nobody had a problem with it, the agency's experience was nobody filed comments about it, we're going to cut that out, and if somebody does file a comment, then we'll withdraw the rule and proceed via ordinary notice and comment. Congress used those words, direct final rule, it was an established, understood idea, and imported that into the statute, where if states and industry and efficiency folks all come together and everybody agrees, then you can have a direct final rule. But here, it was really a settlement agreement on a highly controversial issue, where half the, almost half the union objected. We have no problem with the agency undertaking notice and comment rulemaking. What they can't do is ram this through on a controversial issue without notice and comment rulemaking. Did I answer your question, Judge? What's your best example of what you're saying? The best example of controversy or non-controversy? Of what you're, I mean, I'm just, like I said, I'm a little bit struggling with the notion of the fact that they can't put this out there because you all are objecting to it, so if we ended up going with your side, then what happens going down the road for the Department of Energy in trying to make sure that these things aren't, you know, that these things are taken care of? What would they need to do? Very good thing, Your Honor. They just have to go through notice and comment rulemaking. That's all we're asking for. Okay, but all of this time has passed. What differences are you all trying to make? That would be helpful. That would be helpful. The agencies need to consider the tradeoff in lifespan versus energy efficiency. That's just an engineering reality. I mean, we literally attached chapters of undergraduate engineering textbooks saying, hey, guys, if you do this energy efficiency thing, it's probably going to shorten the lifespan, and that tradeoff has to be optimized. You can't just ignore the shortened lifespan, because up to half of the energy used in making your stove, Your Honor, comes in mining the steel, refining the steel, manufacturing the stove, shipping that stove to your home. So if you shorten the lifespan of the stove by two or three months against an energy efficiency gain of 59 cents over the lifespan of the stove, it goes away. It goes away. You're using more energy. You're using more energy. So that is where you feel this has to be addressed? Yes, Your Honor. Absolutely. The evidence in the record is that consumers value lifespan, and they should. I buy a car. I want the car that's going to last 25 years. I don't want the car that's going to last five years. Wow. You have a 25-year car? I just disposed of my 2002 Forerunner. Council, can I ask you a question about the joint statement of joint stakeholder proposal on recommending energy conservation standards? This is the November 8th, 2023. Yes, Your Honor. I guess it looks like it's only signed by industry representatives. I see this footnote about the states that unclear. They didn't sign it. I don't think there's been technical compliance with the statute. If we're treating the statute as checking off boxes, you just need some states to sign on, no states signed on. So I take it that your friends on the other side are going to tell us that the states of California, New York, and Massachusetts were, whatever this footnote means, approve of coordinating something. Did those states or these industry people or the Department of Energy consult with your clients in coming up with this stakeholder proposal? No, Your Honor. There was no phone call, no email, no draft of it, no, hey, we're trying to come up with a fair representation of the views of America. What do y'all think? Not a word. So you read this when you saw it filed, I guess, in the Federal Register? Actually, after, because this was not done loudly, it was quietly deposited in inactive rulemaking dockets. Interesting. I think this is an example of, I'm going to butcher the quote, but Justice Roberts, courts don't need to blind themselves to what everyone can see. This was the Department of Energy and energy activists held a gun to the head of the appliance industry and said, we're going to ban gas stoves or you can accept this lower regulation. That's just the reality of it. We're focusing on the merits, Your Honor. Okay, so if you were writing the most important That's it. I like the merits, too, because I think this is an important issue in a much larger series of cases, is that you can't ram through energy efficiency that's not actually energy efficient because you're shortening lifespan. That's just basic engineering. And you can't ignore basic engineering by saying, hey, commenter, you didn't do the analysis for us. Here's a textbook. It's almost like I'm saying, DOE, you need to pay attention to gravity. It's a thing. Well, you didn't work out the physics for us. That's not the standard. So applying this issue to the merits, the merits kind of operate on two levels. You have what is the legal standard? Okay, the legal standard is that the comments, quote, may provide a reasonable basis for withdrawing the direct final rule. May. It's a probability term. The Supreme Court has said that. We didn't have to establish. We didn't have to win. All that should have done is triggered notice and comment rulemaking. It's a very minimal thing. Kick it out of the DFR process, go through ordinary notice and comment. It's a critical word. And the agency's response is to edit that word out of the statute. It's page 19 of their brief. We respectfully ask the court to find that the agency has forfeited any argument that they complied with the legal standard because they didn't identify and provide in their brief. They edited out the important word. We talked about the consensus issue. And on the reliability and lifespan, everyone that was a part of this just nakedly reversed positions. The agency for years, dating back to 2009, has said, zeroed in on the power supply issue. These have reliability concerns. We're not going to mandate them. In stoves and in microwaves. In 2023, AHAM said nothing can change since 2009. We asked, the agency asked about data. AHAM also provided a pretty extensive engineering analysis. It's page 118 to 121 of the appendix that these power supplies cause reliability problems. And suddenly there's the settlement agreement and everyone flips positions. And no one is left representing the consumers who just want appliances that work. On that note, if there are no further questions, I'll yield the remainder of my time. All right. Yes. We have reserved time for rebuttal. We'll now hear from Sarah Smith from the Department of Energy. May it please the court, Sarah Smith on behalf of the government. The petition is untimely and should be dismissed. Congress has provided that parties aggrieved by rules issued under section 6295 can seek judicial review by filing a petition no later than 60 days after the rule is prescribed. So if somebody files a comment on the 61st day, is your view that that's a timely comment, right? Because it's within the 110, but you have no obligation to respond to it? DOE would have a responsibility to consider that comment by the 120-day withdrawal deadline. But there would be no— That's separate from the question of whether a petitioner would need to file a petition for review to get review in the Court of Appeals. Totally. So if I'm understanding it, you have an obligation because you're a government official and sort of you take an oath like we do to uphold and defend the laws and constitution—the laws and treaties of the United States. So DOE officials would have to think about it and respond to it, but there would be no judicial review if you failed to do that or you did it arbitrarily or you did it capriciously. So— For the 60—for 61st day comment. If the department ends up not withdrawing the rule, it doesn't have to explain that decision. So I'm not sure where the judicial review would come from. If the department does withdraw the rule, then the secretary is required to publish in the federal register the reasons for withdrawal. So there might be review there. But if the department decides against withdrawal, no, I don't know where there would be review for that. So it's interesting. So this 110-day comment period in your review is really kind of two separate comment periods. So there's the 60-day period where you could file a comment and get judicial review and the agents could just give me for the sake of discussion. I realize you have defenses on the merits, but just for the sake of discussion, the particular comment that I'm concerned about is filed on the 61st day and it has a dead-bang winner subsection O problem, right? Because I take your view that under Romanet I, the only relevant things that would require removal of the rule would be something that triggers the subsection O considerations about why the rule must be withdrawn, okay? So just give me for the sake of discussion. This is a good Romanet I subsection O comment. It's filed on the 61st day. You, or not you, obviously, because you wouldn't do this, but your successor in office or somebody at DOE decides, you know what, we like this DFR anyway. We're going to do it no matter what, no matter what the comments say, and we're going to just ram it through. There's no judicial review even when Romanet I and O are met in a 61st-day comment. There wouldn't be judicial review of the decision to reject that comment. Again, assuming that the department never, it doesn't have to explain this decision, whatever merits of that, you know, dead-on comment, the petitioner could bring that in their petition for review and have the Court of Appeals evaluate whatever legal defect they're alleging. And how would they do that? If so, let's do two different hypotheticals and explain, because I don't understand either. The comment is filed on the 61st day. Obviously, they can't get judicial review when they file on the 61st day. Your view is they only have the 60th day. And then two, what if the comment is filed on the 59th day? They still don't know that it's been rejected until the 120th day. So there's no set of circumstances under your understanding of the interaction between the 60, the 110, and the 120 where I could actually know what the department thinks about my dead-bang winner subsection O Romanet I argument until after the period for judicial review has passed. So the comment that's filed on day 61, yes, the petitioner wouldn't get review of DOE's response to the comment. But the substance of that argument could be brought in a petition for review if it identifies a legal defect. This court could set aside the rule. So the substance of the petitioner's claim certainly can get review. But I'm not aggrieved. So on the 60th day, under either hypothetical, there's no aggrievement to me. Say I'm the commenter. I say, you know what? I would like my gas stove to work. I think working gas stoves are good. So here's my comment. And this is why subsection O requires removal of the DFR. I'm not aggrieved until the 110, or I guess the 120th day, right? Because there's no reason to think. I'm sorry. Please. The department's position is that the rule is final when it is published. So we haven't argued that you need to wait until day 120 or something like that before you're aggrieved. So I'm aggrieved on the day the DFR is filed, even though I have no basis whatsoever to believe that the department is going to adhere to a DFR that is directly contrary to subsection O. Because the rule is final when it is prescribed, the petition can be filed at that point. And yes, so the petitioner should file their comment with the department, ask the department to reconsider, and at the same time file a petition for review with the court. That is not a burdensome filing. It's one or two pages, just identifying the rule and the respondent and the petitioners. They could do that and preserve their ability to seek judicial review of the rule. If it turns out weeks and months later that the rule stays in place in contravention of subsection O? By 100, yes. So you would know 120 days after publication that the department has rejected the comment. And, you know, to avoid any unnecessary efforts on behalf of the courts or the agency or the parties, the parties could seek an abeyance if they want during that time period. So if standing is assessed at the time of the filing of the petition, the Supreme Court has said it I don't know how many times. We've said it more. If standing is assessed at the time of the petition and I have to file the petition on, let's just say by your rat logic, the 59th day, how am I injured by the DFR if I don't know that the agency is going to adhere to it? So the petitioner would be injured by the DFR because of the standards that it sets. And those standards are final when the rule is prescribed or published. So the department, I think the petitioner would have standing. I don't see why the petitioner would not. Well, the reason the petitioner wouldn't is because you have absolutely no basis to believe. In fact, by my hypothesis, it would be unlawful for the department to adhere to the DFR because by my hypothesis, the DFR is directly contrary to subsection O, right, by hypothesis. And it's pointed out in the comment. So I've met the various standards that I would need under the EPCA and the APA to have both constitutional and statutory standing. But you wouldn't actually know it until the Department of Energy says, you know what, we're sticking with this. We like the DFR, right, and the rest of these consequences, to heck with them, right, we're just going to do it. But you wouldn't know that until the final decision is made. So I don't understand how I would even have standing to file on the 59th day. You would have standing because, you know, supposing that the rule injures you in some way, the rule is in effect on the 59th day. Got it. So what is the case that says, you've cited to me a couple of Second Circuit cases and a D.C. Circuit case that says that the 60-day deadline starts on the day of the published application of the DFR. Do those cases say that I'm somehow injured, in fact, in a sort of Lujan Article 3 sense by a DFR where I don't know if it's going to stay in effect? I'm unaware of a legal... I point the court to Malise. So that's the D.C. Circuit case that looked at a direct final rule and said that the rule was final when it was promulgated, notwithstanding the fact that the department could later withdraw the rule. And they said that that was so because it was final under Bennett v. Speer because it established the standard. It was a product safety standard. The rule was established when the rule was promulgated. And legal consequences flowed from that rule because it imposed civil and criminal penalties on manufacturers who didn't comply. And that's the same for the rule here. When it was published, it established a new and amended energy standard. Manufacturers are subject to civil liability if they don't comply. If the court has other questions or has no other questions, I'm happy to sit down. You don't want to respond to what he said about the merits? We think that this case should be disposed on the issue of jurisdiction. I understand that. But if we end up saying, nah, we have jurisdiction, then what would you like to say in response to what he said on the merits? Sure. A few points. So my friend has stressed, has argued that because this is a direct final rule, it requires consensus. And I want to point out a few ways in which this direct final rules and why that's important. So, you know, as I mentioned in our brief discusses, this direct final rulemaking authority came out of the fact that DOE was not able to keep up with the schedule. The Act requires DOE to periodically revisit these standards every six years, and DOE couldn't do that. So Congress's purpose was to speed along these rules. So it isn't that DOE came to Congress and said, these things are uncontroversial, we don't get any comments, let's just do it by direct final rulemaking. That's not what happened. Speed was the focus. Second, this is also different than other direct final rulemaking authority because DOE cannot do this on its own initiative. It has to be presented by a joint agreement that's negotiated by manufacturers and other key stakeholders that come to the agency and say, look, we have negotiated on our own, these are the standards we want, please accept them. So it's different in that respect. It isn't the case that DOE is just on its own volition avoiding notice and comment. And then the last point I would make is that DOE actually proposed direct final rulemaking authority under which they would withdraw the rule upon adverse comment, and that is not the path that Congress chose. Congress added C-1-2, which, so C-1 says that the Secretary has to receive an adverse public comment, and then Congress added that based on the rulemaking record, the Secretary must determine that that public comment may provide a reasonable basis for withdrawing the rule under subsection O or other applicable law. So Congress made clear that just any adverse comment is not enough. It's not simply that somebody objects. The comment has to identify a legal problem with the rule that really gives the Secretary pause and says, we need to go through notice and comment rulemaking. Counselor, can I back you up? Because I appreciate the O and the subsection 1, and that makes some sense to me. What I'm hung up on is P-4A. So P-4A says you have to have fair representation of the stakeholders. So we agree that states are a relevant stakeholder. That's obviously statutory consideration. So I have a two-part question about states. Number one, I don't understand, like, this joint statement that appears in the appendix at 253 is not signed by any state. And in fact, it says that it's submitted by these industry representatives. It says, you know, it's signed by Ms. Cleary and Ms. Maurer on behalf of, and then a list of a bunch of, like, industry groups. But it does not say on behalf of the states of California, Massachusetts, and New York. So I'm not sure why that's not dispositive of the merits. So that's kind of question one. And if you can stay with me, I'm sorry for the compound question. But my second question is, is it the position of the United States government that the states of California, Massachusetts, and New York are fairly representative of the United States? So taking your first question, Your Honor, Petitioner never argued, and it's common as far as I know, and certainly not in the Court of Appeals, that the joint agreement was insufficient because those states did not sign. Their argument was that it needed, that the joint agreement needed to be supported by a concurrence of states across the ideological spectrum. So they have not preserved that argument or made it here. And as Your Honor mentioned earlier, those states at the same time or shortly thereafter submitted a letter explaining that they participated in the negotiations and that they were supportive of them. And then for your second argument, so looking at the text of the statute, the joint agreement needs to be, and this is, the Secretary has discretion, fairly representative of relevant points of view, including, and then there's three groups, representatives and manufacturers, states, and efficiency advocates. So the statute ensures those relevant points of view that the statute cares about are those key stakeholders. And here, DOE didn't abuse its discretion in determining that because there were representatives from each of those groups, that the fairly representative requirement was satisfied. The statute says nothing about ideological diversity. It doesn't say anything about the states needing to be diverse in terms of who their leaders are. The diversity that the statute cares about are these, the key stakeholders in these efficiency rulemakings, which tend to be manufacturers. And on the other side, the efficiency advocates that want, you know, higher standards, manufacturers want lower standards. Those are the groups and the perspectives that the statute requires to support the joint agreement. I appreciate that. Could we do one manufacturer, one efficiency group, and one state? And then so the state of Texas, right? Enormous economy. Could it get together with one of its manufacturers and one of its efficiency groups and submit a DFR proposal? And then it's in the discretion of the Secretary to do whatever the state of Texas suggests is fairly representative of the United States. So depending on the identities of those groups, that might be an abuse of discretion here. Let's do like the biggest manufacturer, the biggest efficiency group, and the state of Texas. That is not this case. Sure. I mean, I think it would maybe depend on what's the market share of the manufacturer. Did they represent all the covered products? Like those are the sort of determinations that the Secretary would need to make. And if someone filed a timely petition for review, this court could evaluate whether that was an abuse of discretion. But here, the AHAM represents nearly 100% of the companies that manufacture these covered cocaine products. There's national efficiency and environmental organizations. And then there are, of course, three states that also provided their support. So under these facts, the Secretary did not abuse of discretion. Yeah, I appreciate that. So it sounds like I should care about how big and representative they are, if they are an industry group or an efficiency advocate. So you said 100% of the share, big efficiency advocates. So we have three categories of stakeholder. I should care, as you pointed out, market share matters, right? So representativeness matters when it comes to companies. And bigness and market share and representative matters when it comes to the industry efficiency groups. I'm sorry, the sort of efficiency environmental groups. But then when it comes to the states, I could do three states that have nothing whatsoever to or one state that is not at all representative of the United States, and I could call that fair representation? So all I meant in stressing the size of especially the AHAM, the companies that it represents their market share, I just meant to say that the market was really represented in this case, and that goes to why this is not an abuse of discretion. As for the states, I think that, again, if we step back and think at what Congress was trying to get at, it's trying to make sure that these joint agreements were negotiated by people who are the parties that represented the different perspectives in these efficiency standards. And I think that's generally going to be the regulated party that cares, because it's being regulated. It's going to affect its cost, its price, everything. Efficiency advocates and consumer advocates, which are represented here. States also, of course, they care about efficiency, they care about price, they manage utilities often, so that's relevant, and there are also utilities that participated in this and were supportive. So I think that the Secretary did not abuse this discretion here, and the states are large states. And the current Secretary is a different one from the prior Secretary and is not telling you don't come make this argument? That's right. DOE is defending the rule and defending the jurisdictional limits that Congress has provided. Okay. Thank you. Any other questions? Okay. Thank you. If there are no further questions, we ask that the petition be dismissed. Thank you. All right. We'll hear from St. John. Three quick points, Your Honors. First, to Judge Oldham, regarding whether the petitioner states raised the issue with states, we noted that states objected earlier. It's the same set of states. That's at page 12 of our brief. We objected to the cherry-picking of support. That's page 26 of our opening brief. And then there's the footnote that Your Honor referenced where we called out that these three states didn't even sign the letter. So I do think that is fairly within this case. Second, I do appreciate my colleague conceding that there can be judicial review of this. I think that's important. The question, though, is how that's structured. The kind of hornet's nest we're getting into, the slicing and dicing, that was exactly what Clifton Power and Brotherhood of Locomotive Engineers were addressing. We stopped the clock when there is a timely filed comment to avoid the slicing and dicing, to avoid the need for a protective petition for review. If we do slice and dice on the first 60 days of the comment period, well, then you still have a comment filed on the 61st day, and you still have a final agency action. And if DOE's position is that I can't come to this court under the PFR provision, then I don't have an adequate remedy. And the answer for that is this is a normal APA case, and you transfer us to district court, just like we asked in our opposition to the motion to dismiss. And if that's the way the court wants to go, we would ask that this case be transferred to the Southern District of Mississippi, where the state of Mississippi obviously has standing and jurisdiction. Because the issue is one of standing, Your Honor, there's still some type of reconsideration pending. That was Clifton Power, and notably the United States did not address Clifton Power, despite it being brought to their attention. If there are no further questions, thank you. All right. We appreciate both sides' arguments, and this case is now under submission.